AMOR H. HARVEY,

*vs.*

WILLIAM G. PENNYPACKER, executor of ACHILLES HOLLINGSWORTH, deceased, and SUSAN Z. HOL-LINGSWORTH.

*New Castle, Sept. T. 1872.*

To establish a resulting trust in one person of land purchased in the name of another, to whom the title is conveyed, it is essential that the party setting up the trust shall have paid or become bound for the purchase money, on his own account, and as part of the original transaction of purchase.

Payment of the purchase money by way of a loan to the nominal purchaser raises no resulting trust.

Parol evidence is admissible to prove payment of the purchase money by the party setting up the trust; but the proof must be " clear, full and satisfactory." And more especially is this required where the trust is not set up until after the lapse of many years, and after the decease of the party holding the legal title.

If the party who sets up a resulting trust fail to prove that he paid the purchase money, he will not be permitted to show by parol proof that the purchase was made for his benefit or on his account.

Against one who has purchased land in his own name, paid the purchase money and taken the legal title, a trust cannot be set up except under a contract in writing, sufficient within the Statute of Frauds.

H., a member of the firm of H. H. & Co., bid at a sheriff's sale of real estate, took a conveyance to himself, paid in cash ten per cent. upon the purchase money and gave his own obligations for the residue. The ten per cent. was drawn from the partnership funds, as also were sundry payments afterward made on account of both principal and interest of the obligations given for the residue of the purchase money; but H. (the purchasing partner) was charged from time to time on the partnership books, with the payments so made and for expenses paid by the firm on account of the real estate, and he was credited with sundry sums received by the firm from the real estate. *Held*, under these and other circumstances that there was no trust of the real estate, either resulting or express.

A court of equity will not, upon the dissolution of a partnership, direct the taking of partnership accounts under its decree, unless there be some necessity for its interposition; as where a decree is necessary to remove some impediment to a settlement or to compel a delinquent party to perform some duty with respect to it. The proper occasions for the Court's interference stated.

Where it was sought to establish a resulting trust in favor of a partnership, against one member of the firm who held the legal title, declarations of the other members of the firm tending to establish the trust are inadmissible, unless made in presence of the defendant.

A trust may, in this State, where the Statute of Frauds on that subject is not in force, be established by parol; but subject to the general rules governing the admissibility of testimony, which exclude declarations of a party in his own favor, or of third persons, not in the presence of the parties to be affected.

A witness familiar with the business and relations, and interests of the partners in a firm may state his general knowledge on these points; and his stating his belief is not objectionable; subject to cross-examination as to the grounds of his knowledge.

A witness cannot be impeached by showing that he has made contradictory statements, without first examining him as to making such statements; and if the statements have been made in writing it must be shown to him.

A single letter selected from a series may be admitted in evidence without accompanying it by the whole correspondence; but if the letter offered in evidence purports to be a reply to one referred to in it, the one in reply to which it was written must be called for, and, if produced, put in evidence with it.

A receipt for the payment of money by a surviving partner, in liquidation of a debt of his late firm. is not admissible in evidence as an exhibit; but the party who received the money should be called as a witness to prove the fact of payment.

BILL IN EQUITY TO ESTABLISH A RESULTING TRUST AND FOR AN ACCOUNT.—This bill was filed by Amor H. Harvey, as the surviving partner of the late firm of Hollingsworth, Harvey & Co., against the executor and devisee of his deceased co-partner, Achilles Hollingsworth.

The prayer of this bill is two-fold :

1st.—That a partnership account may be taken under the decree of the court, and

2d.—That certain real estate, the title to which was held by Hollingsworth in his life-time, may be decreed to be partnership property, and that the same may be sold, and the net proceeds brought into the partnership account, the executor of Hollingsworth being also held to account for the rents and profits of the real estate, which have accrued while the same was held by Hollingsworth.

This real estate was purchased by Hollingsworth, at a sale by the Sheriff of New Castle County, made August 18th, 1849, under certain executions against James Hollingsworth and Joseph Teas, by virtue of which their real estate, part held by both jointly, and part by James Hollingsworth severally, was sold for the payment of their debts. Among the debts which were liens against the real estate, at the time of the sale, was a judgment held by

the then firm of Harvey, Hollingsworth & Co., for $2,650. and also two judgments held by James Rice, one for $1,500.00, and the other for $1,200.00. There were other liens of considerable amount, prior to the judgments of Harvey, Hollingworth & Co., and of James Rice.

The real estate was sold under several executions; one was a *levari facias* of the Wilmington Savings Fund Society vs. James Hollingsworth, under which a parcel of real estate held by him severally, was sold for $4,000.00. The other sale was under an execution upon Rice's $1,200.00 judgment, by virtue of which, the real estate of Hollingsworth & Teas, consisting of their shop and fixtures was sold for $6,040.00. Achilles Hollingsworth bid off the whole of the real estate, took the title in his own name, and so held it at his decease. By his will the real estate was devised to the defendant, Susan Z. Hollingsworth, who now holds it.

The charge of the bill is, that the purchase was made by Hollingsworth, on account of the firm of Hollingsworth, Harvey & Co., pursuant to an arrangement previously made between the partners, to the effect that the property should be bid up for the firm so far as to cover its judgment, and the two judgments of Rice against Hollingsworth & Teas: that the title was taken in Hollingsworth's name for convenience; that the purchase money, so far as it has been paid, was paid with the partnership funds; that the real estate has been largely improved at the expense and with the means of the company; and that the judgments held by the firm and by Rice, against the real estate, prior to and at the time of the Sheriff's sales, to secure which was the alleged object of the purchase, were never otherwise paid than by forming part of the aggregate value of the property so purchased and improved.

The case thus made by the bill and insisted upon in argument for the complainant was mainly that of a result-

ing trust from the payment of the purchase money ; but also that independently of the payment of the purchase money there was a sufficient case of an express trust by agreement or arrangement between the parties at the time of the purchase, which, though resting upon parol evidence, is admissible under the Statute of Frauds, of this State which does not, like the English statute, require trusts to be evidenced by writing.

The answer denies *in toto* that the purchase money or any part of it was paid by the firm, or that there was any agreement or understanding whatever that the purchase should be made for the firm,—alleging that Hollingsworth bought the property on his account solely, paid the purchase money, and from the time of the purchase until his death, held it as his own,—his exclusive title during all his life-time being not only unquestioned by his co-partners, but uniformly recognized by his co-partner, the present complainant.

The evidence which was material and the views taken of it by the the Court are fully stated in the opinion.

THE CASE came to a hearing October 22d, 1872, being an adjourned September term. After the reading of depositions and proof of exhibits, and before the argument upon the case at large, the Court proceeded to hear the exceptions to testimony and exhibits.

The exceptions to complainants interrogatories were all waived, except those to the 12th interrogatory, which was as follows : " Were you at any time, prior to or about " the time, or subsequent to the 12th day of August, 1849, " in the employ of Hollingsworth, Harvey & Co., as a " clerk, book-keeper or otherwise ?   If yea, state whether " or no during said time you received information from the " members of said firm, or either of them, during its " continuance, for whose use the said real estate of Hol-

" lingsworth, Harvey & Co., was purchased, and in what
" manner Achilles Hollingsworth held the title of it.
" State all your knowledge."

To this interrogatory exception was filed as follows:
" That it seeks to put in evidence declarations of the
" complainant in his own favor, and declarations of per-
" sons other than Achilles Hollingsworth, for the purpose
" of binding Achilles Hollingsworth and the defendants,
" who are his representatives.

*S. M. Harrington,* for the exceptants.

Declarations or acts of Hollingsworth are undoubtedly
admissible.   The objection is to declarations either of
complainant in his favor, or of other persons to bind
Hollingsworth's estate.   The inquiry as to Harvey violates
two rules; (1.) That no man give evidence for himself,
nor (2) can one claiming to be a *cestui que trust* establish
the trust by his own declaration.   *Bartlett vs. Pickersgill,*
1 *Eden.* 515 ; *Shimpfler vs. Roberts,* 6 *Harris Pa.* 283 ;
*Kisler vs. Kisler,* 2 *Watts,* 323.

This interrogatory is the more objectionable because
it inquires generally how the property was held, not as to
any fact out of which the trust is to arise.   The com-
plainant is enabled to establish the trust as a conclusion
of law.   *Steere vs. Steere,* 5 *Johns. Ch.* 20 ; *Dyer vs.
Dyer,* 1 *Leading Cases in Eq.* [203] *note.*

*G. B. Rodney, contra.*

The interrogatory looks to an agreement between
the parties, prior to the sale, to buy the real estate for the
firm.   This is admissible, not of itself to establish a trust,
but as a fact relative to the question, and embracing all
the firm.   This is not within the rule excluding testimony
by one for himself.   Declarations by one partner as to the
firm are admissible because of their relations.   They are
not as strangers.

THE CHANCELLOR :—

The interrogatory would be admissible so far as it seeks the declaration of Hollingsworth, or of any member of the firm in his presence, tending to establish a trust, but is clearly objectionable in inquiring for declarations made by Harvey, or any other member than Hollingsworth not in his presence. A trust may in this State, where the Statute of Frauds on that subject is not in force, be established by parol, but subject to the general rules governing the admissibillity of testimony, and which exclude declarations of a party in his own favor, or of third persons not in the presence of the parties to be affected.

The exception is sustained so far that any testimony as to declarations of Harvey or any other person than Hollingsworth, not made in his presence, will be expunged.

EXCEPTION was also taken by defendant to portions of the testimony of Joshua S. Valentine, who had been a clerk for the firm of Hollingsworth & Co. and its predecessors, Pierson, Hollingsworth & Harvey ; to the whole of his answer to the Fourth interrogatory, viz : "I believe "the complainant had an equal interest with the other "partners in the firm of Pierson, Hollingsworth & Har-"vey." In answer to the Eighth interrogatory the witness stated that he was acquainted with several members of the firm, and who they were, and that " Mr. Hollings-"worth was the financier always, so far as I have knowl-"edge, and gave attention to the books. It appeared to "be Mr. Harvey's business to attend to the work in the "shops. I dont believe he knew anything more about the "finances than I do."

The exception was to so much of the above as stated the witness believed Harvey knew nothing about the finances.

To the Tenth interrogatory, the witness replied. "Achilles Hollingsworth, one of the firm about the time "last inquired about, was dependent on the business of "the firm for his support, and had no other visible means, "&c.   I do not now recall any specific facts."

*S. M. Harrington,* for exceptant.

*G. B. Rodney, contra.*

THE CHANCELLOR :—

The answers to the fourth and eighth interrogatories are admissible.   The witness appears by his testimony to have been a clerk of the firm, familiar with the business and the relations and interests of the parties. His general knowledge on these points is admissible.   His stating his belief is not objectionable ; it goes to show the degree of positiveness of his knowledge and effects the weight of his answer.   His whole answer is subject to cross-examination as to grounds of knowledge.   That is a sufficient protection, if he speaks without due grounds.

The tenth interrogatory calls for a general fact, a man's means of support,   It may be answered in general terms by one standing in a relation giving him a general knowledge of the person inquired of subject to cross-examination.   Though he could not then recall specific facts, that does not exclude his general statement, though it greatly reduces its weight.   Exceptions overruled.

ON THE part of complainant, Mr. Rodney offered in evidence as exhibits a letter from Charles I. Robb to John V. Rice, dated March 31, 1870.   Robb had been a book-keeper for the firm of Hollingsworth, Harvey & Co., and after the dissolution of the firm by the death of Hollingsworth had been employed in connection with winding up the business of the firm.   John V. Rice had been engaged

as the agent of Harvey in the examination of the accounts of the firm, and in seeking a settlement on Harvey's behalf from the defendants.

Robb was the principal witness, in of the defendants, and the letter was offered on the ground that the correspondents were the representatives of the plaintiffs, and for the purpose of discrediting Robb's testimony.

*S. M. Harrington*, for the defendants, objected.

1. It is *res inter alios acta*, a correspondence between third parties.

2. It is only one letter of a series ; though all are stated in the list filed.

3. It seeks to raise a collateral issue, in order- to impeach Robb's testimony.

4. It is not competent to use it to discredit Robb, unless it has been first shown to him.    1 *Green. on Ev. Section* 463.

*G. B. Rodney*, *contra.*

The bill and answer recognizes Robb and Rice as the representatives of the parties in the transaction involved in the issue.   It is not necessary to produce their letters, except where they are referred to or shown to be connected with this case.   The letter is admissible to show a statement different from that which Robb has made as a witness.   It is not necessary to show witness the letter.

THE CHANCELLOR :—

This letter is objected to as being *res inter alios acta.* It is such on its face, and is within the rule excluding evidence of that sort unless shown to be within some exception.   It is offered as being an exception to the rule in two respects.—First, that Robb, the writer, was the agent

for Pennypacker for the purpose of effecting a settlement with Harvey, and wrote the letter in the course of such agency to Rice, as agent also for Harvey. But such does not appear to be the fact. According to all that appears from the bill, answer and evidence, Robb was not Pennypacker's agent, but was employed only as an assistant in the act of making a settlement, having no authority to represent or bind Pennypacker in anything, either before, at, or after the settlement. The other ground urged for admitting the letter is that it is inconsistent with Robb's testimony as a witness. For that purpose it might be admitted, had Robb been first examined as to the fact of his having written it. A witness cannot be impeached by showing that he has made contradictory statements without first examining him as to his having made such statements, and if the statements have been made in writing the writing must be shown to him. Such is the rule. 1 *Greenleaf on Ev. Sec.* 462-463. Robb has not been examined with respect to this letter.

Another objection to the admission of the letter was that it is a single letter selected from a series, and cannot be offered without accompanying it with the whole correspondence. I do not find the rule laid down so broadly as this ; but it is held that if the letter offered in evidence purports to be a reply to one referred to in it, the one in reply to which it is written must be called for, and if produced put in evidence with it.

The letter in question is not admitted.

Mr. Rodney offered the receipt of Victor DuPont for $11.99 to A. H. Harvey as surviving partner, dated November 3, 1866 for costs on judgment of John Rice against Hollingsworth, Harvey & Co. ; and for costs on judgment against Hollingsworth. The receipt was offered as evidence tending to show a payment by the firm on the judgment referred to, which had been a lien upon the real estate in controversy.

*S. M. Harrington*, for the defendants, objected.

This is a transaction between Harvey and DuPont, by which Harvey, by professing to act as surviving partner, makes evidence for himself.    Hollingsworth was not a partner to it, and not to be affected by it.

*G. B. Rodney*, *contra.*

THE CHANCELLOR :—

The fact that Harvey paid this money and that he paid it in the character of surviving partner is a fact admissible to be proved in the case ; but not by the receipt of Mr. Dupont.    If proved by Mr. Dupont, he should have been examined as a witness.

The receipt is not admitted.

The argument of the case on the merits then proceded, and was mainly devoted to the questions of fact arising in the case, upon which the testimony was complicated and conflicting.    The principles of law involved were subject to little controversy.

*G. B.* and *J. H. Rodney*, for the complainant.

First, as to Partnership account.

The law that real estate bought with partnership funds is, in equity, partnership property, is indisputable. The payment for the land with such funds raises a trust for the partnership.    2 *Sto. Eq. Jur. Sec.* 1206.

The Statute of Frauds does not apply to resulting trusts, and such a trust may be proved by parol.    *Browne on Frauds,* 79, 90 ; *Boyd vs. McLean,* 1 *Johns. Ch. R.* 584 ; 1 *Johns. Cases* 155 ; *Fawcet vs. Whitehouse,* 1 *Russ. & Myl.* 132 ; 2 *Edw. Ch.* 373 ; *Perry on Trusts,* 127.

A trust results upon the payment of the money.

*White vs. Carpenter*, 2 *Paige* 238 ; *Newells vs. Morgan*, 2 *Harring.* 230 ; *Watts vs. Ball*, 1 *P. Wms.* 108.

The trust carries an interest in proportion to the amount of money paid, if it be a part payment. *Bottsford vs. Burr*, 2 *Johns. Ch. R.* 410 ; *Bartlett vs. Pickersgill*, 1 *Eden*, 525 ; *Brown on Frauds*, 85-87.

The admissions of Hollingsworth in his lifetime are admissible, though proved after his death. *Sugden on Vendors*, 617.

Whatever effect is to be given, in equity, to the Statute of Limitations, it can have no application to this case, for the property has been held by Hollingsworth, Harvey & Co., and enjoyed as their own.

*S. M. Harrington*, for the defendants.

The case rests solely upon the doctrine of resulting trusts, which in this State are as at common law ; the English Statutes not having been re-enacted. 1 *Am. Lead. Cases in Eq.* 225.

It is true that a partner holding legal title holds for the firm the property bought for its use and with its money. But there must be no doubt. Payment by a party through an agent cannot be proved by parol. *Steere vs. Steere*, 5 *John* 20 ; *Bartlett vs. Pickersgill*, 1 *Eden* 515 ; *Willis vs. Willis*, 2 *Atkins* 71 ; *Faringer vs. Ramsay & Ehrman*, 4 *Md. Ch.* 33.

Resulting trusts of questionable policy are cautiously admitted, and strong proof required after much time has elapsed. 1 *Lead. Cases in Eq.* 273.

The trust must arise by an original payment of the purchase money, or a part of it. It is settled that no subsequent payment of the purchase money raises a trust. *Botsford vs. Burr*, 2 *Johns. Ch.* 405 ; 1 *Lead. Cases in Eq.* 275 ; *Browne on Frauds*, 87 ; *White vs. Carpenter*, 2 *Paige*,

218; *Jackson vs. Moore*, 6 *Cow.* 706 ; *Rogers vs. Murray*, 3 *Paige*, 390 ; *Forsyth vs. Clark*, 3 *Wend.* 638, 646, 650—1.

The utter absence of any claim on the part of Harvey from August 1849 to December 1869, no bill being filed until August 1871, a period of over twenty years, pre-sents a case of laches or staleness of claim which is a de-fense in equity.    The Statute of Limitations is obligatory upon courts of equity, with respect to corresponding inter-ests to those barred at law.    *Hovenden vs. Ld. Annesley*, 2 *S & L.* 630 ; *Strimpfler vs. Roberts*, 6 *Harris Pa.* 283 ; *Stear vs. Bradford*, 2 *Pa.* 394 ; *Foulk vs. Brown*, 2 *Watts*, 214—15 ; *Carey vs. Callan*, 6 *Beavan* 44 ; *Enos. vs. Hunter*, 4 *Gil-man's Ill. R.* 211.

The fact that the claim was left to sleep until after the alleged trustee's death renders it one of more dis-favor, as stated by C. J. Black in the case of *Strimpfler vs. Roberts.    Saunders on Uses and Trustees*, 353.

Another objection to the complainant's claim is the uncertainty of his interest.    There is no proof that he was an equal partner ; no evidence but Valentine's belief referring to the period of 1841.    To raise a trust the con-tribution must be of a definite part.    *Sayre vs. Townsend*, 15 *Wend.* 651 ; 1 *Lead. Cases* 277 ; *Baker vs. Vining*, 30 *Me.* 121 ; *Brown on Frauds, Sec.* 86.

There are undoubtedly cases opposed to the rule that parol proof is admissible ; but the true rule would be to follow the middle course, that such proof is admissible under special circumstances, such as sudden death, dis-abling the claimant from getting a conveyance without *laches.*    In this case there has been gross neglect, and it should stand upon the old rule.    *Roberts on Frauds*, 99 ; *Clalk vs. Downes*, 1 *Ch. Cases* 110; *Enos vs. Hunter*, 4 *Gilman* 211 ; *Lloyd vs. Spillet* 2 *Atk* 150.

Another principle is that no resulting trust will be raised against the declaration of the party advancing the

58—DEL. CH. IV.

money. *Bottsford vs. Burr,* 2 *Johns Ch. R.* 405; 1 *Lead. Cases in Eq.* 278; *White vs. Carpenter,* 2 *Paige,* 218.

THE CHANCELLOR :—

It will be convenient to consider, first, the prayer for relief with regard to the real estate.

Aside from the main points at issue raised upon the bill and answer, the defendants' solicitor took in argument several collateral objections not entering into the merits of the case ; but these I shall not find it necessary to consider.

The objections referred to were :

1st.—The uncertainty, on the proof, of the extent of the complainant's interest, whether or not he was an equal co-partner.

2d.—The want of sufficient parties : since a trust of the real estate, if any there were, included Rice as one of the firm at the time of the purchase, and yet the bill sought to establish the trust in favor only of the latter firm of Harvey & Hollingsworth : 

3d.—The further ground that after the death of the legal owner, Hollingsworth, a trust of the property cannot be established by parol ; and

4th.—The objection that there had been laches on the part of the complainant, in making ·no claim until more than twenty years after the trust, if any, was created ; connected with which, also, it was argued that the settlement with Hollingsworth's executor, recognizing as it did, Hollingsworth's title to the real estate, was in effect a waiver or abandonment of any trust which might originally have attached to this property.

I pass by all these objections and confine myself to the main question, *i. e.* whether the purchase by Hollings-

worth was subject to any trust for the firm, resulting or express, or whether it was a purchase on his own sole account?

And first, was there *a resulting trust*? It will greatly simplify our investigation on this point to observe at the outset several well settled principles in the law of resulting trusts. One is this : That to raise a trust of this nature there must have been *actual payment of the purchase money or liability incurred for it,* on the part of the *cestui que trust.* A resulting trust is an equitable ownership raised directly out of the payment of the purchase money, such payment being the sole consideration and ground of the trust, and not any agreement or understanding of the parties ; so that, from the very nature of the trust, actual payment of the purchase money, or what is equivalent, an obligation assumed for it, is indispensable ; and without this no agreement of parties for a trust or proof that the property was in fact purchased by one for another, can establish a *resulting* trust, whatever other equities may arise out of such agreement or understanding.

Another principle is that the payment of the purchase money must, in order to raise a resulting trust, have been made, or the liability for it incurred *as part of the original transaction of purchase,* and not pursuant to any subsequent agreement or arrangement between the parties ; for a resulting trust must have been coeval with the purchase and have attached to the legal estate when it was taken under the deed. 1 *Lead. cases in Eq.,* 176–7, *Am. note to Dyer v. Dyer* ; *Bottsford v. Burr,* 2 *John, Ch.* 405 ; *Rogers v. Murray,* 3 *Paige,* 398.

Besides these two rules which have respect to the nature of a resulting trust there is another,—one very important to be observed,—which concerns the measure of parol proof required to establish such trusts. With respect to the *kind* of parol evidence admissible to prove the payment of the purchase money by the party claiming

to be a *cestui que trust* the cases have taken a very wide range, including all the acts, transactions and declarations of the parties ; for parol evidence having been once admitted to raise this sort of an equity in land it was found impossible to narrow by artificial rules the use of such evidence to any special kinds or classes of parol evidence. I *Lead. Cases in Eq*., 180. But all authorities agree that the establishment of such trusts, not only without deed, but in direct opposition to the written title, is contrary to the true policy of the Statute of Frauds and is of dangerous tendency ; [18 *Penna. State Repts*., 298 ;] and hence, by general consent, while no restrictions are placed upon the reception of any kind of parol testimony to establish a resulting trust, it is held that the measure of such evidence required to overcome the presumption in favor of the legal owner must be "*clear, full and satisfactory*." I *Lead. Cases in Eq*., 176 ; *Boyd v. McLean*. I *Johns. Ch. R*., 590. More especially will this caution be exercised, where, as in this case, a long time, hardly less than twenty years, has elapsed between the purchase and the first attempt to set up the trust ; for, in addition to the natural and reasonable presumption which unexplained delay raises against the claimant, the Court must consider the risks and difficulties likely to have resulted to the legal owner from lapse of time in the loss of testimony to rebut the claim. And further, with very far greater force must these considerations apply to subject a claim to disfavor and to an exacting measure of proof in support of it, when the claim has been withheld, as this was, without any apparent necessity, throughout the lifetime of the legal owner—a period of seventeen years, from the purchase in 1849 to Hollingsworth's death in 1865,—and is then made against the representatives ; for, by this delay, all explanation of the original transactions which might have been made by the answer of the original party is cut off, and his greatly superior opportunities for adducing proof against the claim are lost. So strong a ground of disfavor

has delay until the death of the legal owner been regarded, that some able law writers hold such delay to be even *a bar* to the proof of a trust by parol against the legal title held under a deed. *Saunders on Uses and Trusts*, 354; *Roberts on Frauds*, 99. These opinions are not sustained by the best authorities. 2 *Sugden on Vend.* 349, *chap.* 20, *sec.* 1 ; *Lench v. Lench*, 10 *Ves, Jr.*, 511 ; *Boyd v. McLean*, 1 *Johns. Ch. R.*, 587. But in all such cases, although a trust contrary to the face of a written deed, may be set up after the death of the parties, greater caution will, on that account, be exercised by the Court in weighing the evidence of it. Nor, let it be added, does the stringency of proof thus required work any wrong to the *cestui que trust;* for, since he has voluntarily omitted to secure his rights by the kind of evidence appropriate to such transactions, *i. e.*, written evidence, leaving them to be established by parol evidence only, he may rightly be held to such a measure of parol proof as is necessary to guard securely against the dangers of that sort of evidence.

I now propose to take up the decisive question, viz., does it appear by evidence "clear, full and satisfactory" that the firm of Harvey, Hollingsworth & Co. did, on their own account as purchasers, and as part of the original transaction of purchase, or as an obligation springing out of the original transaction, pay the purchase money for these premises or an aliquot part of it?

The purchase money was $10,040. Of this sum 10 per cent., or $1,004, was received by the Sheriff from Hollingsworth. Some expenses connected with the purchase, added to the 10 per cent., made $1083.38, which was the sum actually paid upon the property at the time of the purchase. The whole real estate purchased was, before the purchase, subject to sundry liens, to which the purchase money was applicable, but no money over and above the 10 per cent. was, in fact, paid to the sheriff and applied to the liens. Instead thereof, Hollingsworth on the

28th of Dec. 1849, substituted his own bonds, with mortgages of the several premises puchased, in lieu of the liens, as they stood in priority, up to the amount of the purchase money, $10,049.64.

The bonds and mortgages thus given by Hollingsworth were as follows :

| | |
|---|---:|
| 1. To the Wilmington Saving Fund Society, for .. ............... | $2,400 00 |
| 2. To Ann Billany for......... ..... | 700 00 |
| 3. To the Delaware Fire Insurance Company for...................... | 450 00 |
| 4. To the Farmers' Bank, afterward assigned to the Saving Fund Society, for............. ...... | 2,100 00 |
| 5. To McDaniel & Harvey, afterward... assigned to Jesse Lane, for..... | 1,800 00 |
| 6. To John Rice, a judgment bond for . | 1,595 64 |
| Total,..................... | $9,045 64 |

There was also a mortgage of $600 of Teas and wife to the Wilmington Fire Insurance Company, covering part of the real estate ; but the premises covered by it were sold subject to it, and hence it followed the property, and no account was taken of it in settling for the purchase money.

Of the securities thus given, there were paid off in Hollingsworth's life-time—by whom is a point in issue— the following :

| | |
|---|---:|
| Ann Billany's mortgage for.... ....... | $ 700 00 |
| On account of the McDaniel & Harvey mortgage for 1800, held by Lane, | 800 00 |
| The Rice judgment for ............... | 1,595 64 |
| Total, ........................ | $3,095 64 |

After the death of Hollingsworth there were paid on these securities, out of his estate—as to which payments there is no dispute—the following sums, viz.:

| | |
|---|---:|
| The Delaware Fire Insurance Company's mortgage for........ ..... | $ 450 00 |
| On account of the Farmers' Bank mortgage for $1,100 held by the Savings Fund,.............. | 500 00 |
| And the balance due on the McDaniel & Harvey mortgages of $1,800, | 1,000 00 |
| Total,.............. .... .. | $1,950 00 |

There remains yet unpaid :

| | |
|---|---:|
| The Wilmington Savings Fund mortgage for....................... . | $2,400 00 |
| Balance due on the Farmer's Bank Mortgage, also held by Saving Fund, | 1,600 00 |
| Total unpaid,.... ............ | $4,000 00 |

The controversy as to who paid the purchase money can of course have no application to the balance of $4,000.00 still unpaid, nor to the $1,950.00 paid out of Hollingsworth's estate since his death, making in all $5,-950.00. The claim is that the firm paid the residue of the purchase money, embracing the 10 per cent., or $1,004 00, and the several sums amounting to $3,095.64, which were applied in Hollingsworth's life-time to the securities given for the purchase money. Connected with this is also the claim that the firm kept up the interest on all the securities until Hollingsworth's death—from all which is deduced by complainant's solicitors the conclusion that the purchase money, though from necessity secured in the name of Hollingsworth, he holding the legal title, was in fact the debt of the firm.

It is true that a considerable portion, though (as I am obliged to conclude) not all of the payments made during Hollingsworth's life-time were drawn from the assets of the firm. The 10 per cent. paid to the Sheriff, together with other small expenses incurred in the purchase, making in all $1,083.38, though settled by Hollingsworth as a purchaser, was drawn from the firm. The payments of interest from time to time on the securities given by Hollingsworth for the unpaid purchase money were also for the most part made by checks of the firm drawn and used by Hollingsworth. So also some portions of the principal of these securities were paid in Hollingsworth's life-time from the partnership funds. Mrs. Billany's mortgage of $700 was thus paid in full, and $800 was applied out of the partnership funds to the McDaniel & Harvey mortgage assigned to Lane.

There is much controversy upon the question whether Rice's judgment for $1595.64 was paid by the firm. This judgment was satisfied after Rice's death under the direction of his executor, as having been settled in Rice's life-time, but by whom or how it was settled, does not appear by any direct evidence. The complainant's case on this point is that the debt secured by this judgment was also represented by a promissory note of the firm to Rice's order for $1500, which was renewed from time to time, the last renewal being by a note for $1500, dated October 12, 1861, at 60 days. This note was, at its maturity, held by the Union Bank of Delaware, was protested for non-payment, taken up by John Rice, came into the hands of his executors and was collected by their attorney from the firm of Hollingsworth, Harvey & Co. But it is clear from the evidence that this note did not represent the judgment, and had no connection with it whatever. It is on its face an accommodation note, discounted by the Union Bank to the credit of the firm, and will be found, on examination of the firm's bill-book, to have been the last of a long series of ac-

commodation notes, made solely to enable the firm to raise money. The series of these notes commenced March 1, 1852, with a note for $1,550.00 at four months, and it was continued at this sum ($1,550.00), though at the shortened time of 60 days, up to May 13, 1853. Then the amount was reduced to $1,500.00, at which sum the renewed notes continued up to March 24, 1860. About that date the bill-book, from which this information is gathered, closes and the succeeding one is not in evidence ; but by calculation it will appear that continued renewals of this note for the same sum ($1,500.00) and at the same time (60 days) will bring the note of October 12, 1861, the one produced and relied upon, into exact correspondence with the series commenced 1852. Now, aside from the character of this note on its face, the bill-book shows by many entries that the whole series was accommodation paper. Entries to this effect are made in the book, not, it is true, on every renewal, but frequently. The entries are "for our accommodation," and they are made April 5, 1856, June 7th, August 22d, October 24th and December 26, 1857, and, February 27, 1858. This irregularity in entering the character or purpose of the note, marks the whole bill-book, occurring as well in other cases as in this. We must then lay this note out of consideration. Nor does there appear from the evidence to have been any other paper of the firm which, according to the theory of the complainant, could have been given either in discharge of this Rice judgment or as collateral to it. Mr. Rodney, Sr., thought there was evidence from the partnership books of the existence of some $1500 note of the firm to Rice which represented this judgment. He particularly relied upon the entries of March 4, 1859, in journal of 1859, p. 5, under head of " Shop, " Dr. to John Rice." But those entries on examination, refer not to any *note* for $1500 ; they show only that prior payments of interest had, through some inadvertance, been calculated upon $1500 as the amount of the judgment, instead of $1,595, and hence two years interest was

59—DEL. CH. IV.

in these entries charged to shop on $95 of the principal before omitted. I have examined all entries through the books relating to this debt to Rice and find no reference to any note whatever as given for it or bearing any connection with it. Further, it is clear from the manner in which these books are kept, that if the firm had in any mode, whether by note or by cash settled the Rice judgment, the settlement must have appeared upon the books. The firm had a long series of transactions with John Rice, in the course of which, from time to time, money was paid and notes were given. All such transactions are entered in the journal and posted in the ledger account kept with Rice. According to the mode in which the journals are kept, if a note had been given to Rice it would have been entered under the head of " John Rice Dr. to Bills Payable." The bill-book would show the same thing more directly ; but that book covering the intervening period after payments of interest cease until Rice's death, the period within which any settlement of the principal must have been made, is lost. So if the judgment had been settled by cash the journal would have shown it by an entry of " Shop Dr. to Cash." The payments of interest on this judgment all appear by such entries. Yet nothing appears anywhere as given or paid towards the principal. I have also examined the cash book from the last entry of the payment of interest until after Rice's death, in which all cash payments by the firm are, or should be, entered, but find there nothing entered as paid to the principal of this judgment. Neither does any such payment appear in the check books of the firm covering the same period ; and none appears in the journal entries of credits to cash, though such entries seem to have been regularly made with respect to other transactions. It would seem impossible that so serious a transaction as the settlement of this large judgment by the firm, if in fact made, should not have disclosed itself in some one of the many modes of keeping a business record of such transactions.

Mr. Rice testifies with respect to the payment of the Rice judgment,—not from any knowledge of his own, but solely as he states from information by Mr. Harvey and Mr. duPont,—that it was paid to John Rice by the proceeds of a discounted note of Hollingsworth, Harvey & Co., which note, he further states, was the same note of October 12, 1861, collected by Mr. duPont after Rice's death. This is all a hearsay statement and should not have been taken in testimony, but at all events the witness is evidently mistaken. Mr. duPont himself testifies that he had no knowledge as to how the judgment was paid. Mr. Harvey though doubtless honest in his impression that the note was given for the judgment was clearly mistaken, as he might well be in giving Mr. Rice this information so long after the transaction.

We have traced the history of this note so far as to be certain that it has no connection with the judgment.

The conclusion then at this point is that there was applied out of the partnership funds towards payment of the purchase money, first the 10 per cent. being $1004 ; then the amount of Mrs. Billany's mortgage, being $700 ; and also $800.00 on account of the McDaniel & Harvey mortgage, making in all of principal $2,504; in addition to which the interest was mainly if not wholly drawn from the partnership funds during Hollingsworth's lifetime. I have not deemed it necessary to ascertain the exact amount of the interest so paid.

But the material question still remains ; *i. e.*, did any trust result to the firm from this part payment of the purchase money ? After great deliberation, I think not ; for the evidence leaves me with the conviction that these were not payments made by the firm on their own account, as the original purchasers of the real estate, which is a condition essential to raise a resulting trust ; nor were they even payments made under any subsequent agreement that the firm should take the real estate from

Hollingsworth to pay for it,—which, however, would not have raised a *resulting* trust, though an *express* trust might have been thus created ; but the real character of these payments was that of a loan to Hollingsworth, for which the firm became not *cestuis que trust* of the real estate, but creditors of Hollingsworth.  Now, it need hardly be said that no trust will result to a person who advances the purchase money as a loan to the nominal purchaser. Ld. Keeper in *Bartlett vs. Pickersgill*, 1 *Eden* 517 ; Sir Wm. Grant in *Aveling vs. Knipe*, 19 *Ves. Jr.* 445 ; 1 *Lead. Cases in Equity*, [149] *note to Dyer vs. Dyer*.    And even supposing there was not a formal loan of the sums applied, but that Hollingsworth having made the purchase on his own account, afterward appropriated the partnershp funds in part payment of the purchase money, that would not raise a resulting trust but would only make him a debtor to the firm ; for, to create a resulting trust the funds must have been appropriated to the purchase as one originally made for the firm, *i. e.*, in pursuance of an agreement or undertaking between the parties at the time of the purchase.    This was a point decided in *Forsythe vs. Clarke*, 3 *Wend.* 650-51.

The character of these payments out of the partnership funds, whether they were purchase money payments by the firm or loans to Hollingsworth, was a question so earnestly discussed that it is due to the learned counsel to state my reasons for treating these payments as money loaned.

In the first place, is the great and it seems to me the invincible fact, that on the books of the firm Hollingsworth was from time to time, from the date of the purchase in 1849, to October 1865, after his death, charged as a debtor for sums drawn from the partnership funds in the part payment of the purchase money and interest, as also for various other expenses paid by the firm on this real estate, such as insurance, repairs and taxes ; and also he

was credited from time to time with sundry sums which came to the hands of the firm from the rents and from machinery sold out of parts of the real estate.

The first of these charges was made Dec. 31st, 1849, just after the purchase was completed,—Journal of 1849, p 1030.   The entry is headed thus.

" Achilles Hollingsworth (for Real Estate) Dr. to "Cash." The first item of the charge is for the 10 per cent. in these words, viz :

" For $1004, which he paid to Isaac Grubb, Sheriff, in " Oct. last being 10 per cent. of the purchase money on the " property late of James Hollingsworth and Joseph Teas, " which he purchased at Sheriff's Sale in August last, $1004."

Then follows a charge of $10 for interest in favor of the firm on the 10 per cent. so advanced,—also of some expense connected with the completion of the title, the care of the property and an item for interest paid on Mrs. Billany's Mortgage.

Following this first entry respecting the real estate, there appear on the Journals, between 1849 and 1865, not less than 92 separate entries of debit and credit as between the firm and Hollingsworth respecting real this estate.

Now these entries have the exact force of so many distinct admissions,—admissions unequivocal, often repeated, and extending through a period of 16 years,—to the effect that the firm had no interest in this real estate. For, treated as the real estate of the firm, and not of Hollingsworth alone, these entries were simply a series of absurdities, stultifying all concerned in them. Plainly the firm could not be both the owner of the real estate and Hollingsworth's creditor for payments made on account of it. Had it been considered the real estate of the firm, there could have been no occasion for any account respecting it, expect the usual real estate account of a partnership kept for the purpose of ascertaining its cost and profit to the firm.

Great ingenuity was exercised to subject these entries to that construction. But the attempt does too much violence to their plain meaning. The mode of keeping the real estate account of a partnership is too simple and well understood to have been mistaken, and that too not in a single entry or in a few entries, but persistently mistaken through a long series of years. It is impossible to believe, without some direct or positive evidence of mistake, (nothing of which is in the case,) that charges against Achilles Hollingsworth by name, for real estate, he in fact holding the title to that real estate—charges for money applied or expenses paid on its account, were intended as a mere real estate account of the firm, or that it meant anything else than what it plainly imports on its face, viz : that the money was paid on account of the real estate as Hollingsworth's, whereby the firm became his creditor for the sums paid.

It may as well be remarked that these drafts upon the partnership funds for payments on Hollingsworth's account and their being charged to him present no such incongruity with the general course of business of the firm as on that ground to raise any doubt that such was the real nature of the transactions referred to in the entries. For the books show that the partners drew, from time to time, at will, upon the partnership funds for a great variety of personal uses, including the payment of their individual liabilities,—the partner drawing being charged accordingly in his personal account.

It should be further observed that the force of these entries of debt and credit to Achilles Hollingsworth on account of real estate is not at all affected by the question, whether the advances for purchase money made by the firm, were ever repaid to it either in a general settlement with Hollingsworth's executor or otherwise.—That was a question of fact very much discussed. I do not, however, find it necessary to consider the question in de-

termining whether or not there was a resulting trust ; for, if the advances were originally made as a loan to Hollingsworth, no trust could subsequently arise from the mere non-payment by him of the sums advanced.  Nothing can be clearer than this.  I therefore lay out of consideration the question, whether or not there was a settlement of accounts after Hollingsworth's death, covering the advances made by the firm for real estate, or whether in any mode whatever these advances have been repaid.

Thus far I have considered the effect of the book entries *alone* upon the question of a resulting trust, exclusive of all collateral testimony.  These entries, taken thus on their face, oppose very cogent evidence, to say the least, against the theory of a resulting trust.  But the case does not rest here,—for concurring with the natural import of the book entries, are the transactions between the parties after Hollingsworth's death, as detailed by the witness, Robb.  His testimony, if credited, establishes these points :—that the executor, Pennypacker, and the surviving partner, Harvey, met ; and that in the presence and with the assistance of the witness, who had been book-keeper for the firm, an examination was made of the accounts of the co-partners.  What was the precise purpose of this, as contemplated by the respective parties, whether for settlement or for arriving at the basis of one, is not here material ; it is enough to take now the uncontroverted fact, that the accounts were brought under an examination, and that if no settlement was in fact made, at least the principles of a settlement were discussed.  In this examination,—so the witness states,—it was well understood that Hollingsworth was in his lifetime the sole owner of the real estate, [pp. 10-11] that in discussing the principles of a settlement "it was all the time under- "stood and talked about, that all the expenditures on "account of real estate were to be charged to Mr.

"Hollingsworth on the idea that he was the owner of it,"
Mr. Harvey being present and assenting to it, [pp. 10-11.]
On this basis,—the witness says,—by direction of the
parties, and with the cognizance and assent of Mr. Harvey,
the cash accounts were analyzed for the purpose of ascer-
taining what cash payments had been made upon the real
estate, and of charging them to Mr. Hollingsworth's real
estate account as distinguished from his personal account.
Now, whatever room there might be for misconception on
the part of Harvey or of the witness, as to the matters
thus far stated, there can be no possibility of it as to some
of the transactions at this interview, stated by the
witness ; such as these :—[1] Harvey, he says, claimed
interest on the 10 per cent. from the time of its payment
in 1849 up to the present meeting, a period of 17 years,
and the interest was allowed to him, [p. 8.]  [2.] There
was, he says, much discussion as to what rental should
be allowed to Hollingsworth's estate for that part of the·
property occupied by the firm, which discussion resulted
in an allowance of $600.00 per annum, and this allowance
was distinctly assented to, by both parties, [p. 9.]  [3]
The adjustment agreed upon respecting certain machinery
which the firm in Hollingsworth's lifetime had taken out
of the real estate and sold, is another point about which
there could be no misconception ; the firm had received
the proceeds and carried them into the partnership assets
by debiting them to shop account.  The witness states
that Mr. Harvey claimed that these proceeds were taken
by the firm in consideration of certain improvements put
upon the real estate by the firm, in Hollingsworth's lifetime,
[p. 12.]  A difference of opinion arose between Harvey
and Pennypacker as to the comparative value of the
improvements, and of the machinery sold, Pennypacker
claiming credit for an excess of value in the improve-
ments.  The dispute was finally settled by Pennypacker's
withdrawing the claim to an excess, in accordance with
an estimate of the improvements, made by Mr. Jarrett

Megaw, [p. 13.]   And the 4th and last point stated by the witness, to be noted in this connection is, that upon the footing up then made of the real estate account there appeared to be a balance due Hollingsworth's estate of $3052.20 ; this balance, he says, was settled by turning over to Mrs. Hollingsworth, the devisee of the real estate, certain shafting, engine and machinery which had been put into the real estate by the firm ; being the same improvements before mentioned as having been set off against the proceeds of machinery sold by the firm, as well as against this balance on the real estate account.

Now, Mr. Robb's detailed statements of these transactions may be disposed of by this general observation,— that although the witness is evidently friendly to the defendants, and as a biased witness his impressions upon points which could be the subject of any misconception ought to be received with caution, yet the specific statements above extracted from his testimony are such as he could not through mere bias be mistaken about. They cannot be rejected, or in any way so qualified as to neutralize their effect, without impeaching his veracity as a witness. That has not been done by evidence and I cannot do it without evidence. Nothing in the manner or substance of his testimony draws even under suspicion his general integrity, and making all due allowance for mere bias of feeling as to points on which that sort of influence could affect his impressions and also making allowance for inaccuracies of recollection, not uncommon as to matters of detail, still there remains in the witness's statement, to be unavoidably accepted, a large amount of proof which is at utter variance with the theory that the firm and not Hollingsworth, were the real purchasers of this property.

The transactions on the part of Mr. Harvey specifically before stated, touching his claim to interest on the 10 per cent. his allowance for rent of the premises, his

60—DEL. CH. IV.

claim on behalf of the firm to the proceeds of the
machinery sold—not as owners of it, but as an equivalent
for improvements put by the firm on the real estate,—and
his insisting upon setting off the value of these improve-
ments also against the balance of the real estate account
appearing in favor of Hollingsworth's estate ; all these
are transactions which Mr. Harvey, with far more moderate
intelligence than belongs to him, could not have admitted
into the basis of a settlement had this real estate been in
fact purchased and paid for by the firm, though held in
Hollingsworth's name.

Let me add, before leaving this branch of the case,
that I have considered how far the force of the book en-
tries respecting the real estate, as admissions of Hollings-
worth's exclusive ownership, may be impaired by the fact,
brought out in evidence and commented upon in argu-
ment, that Hollingsworth managed the finances of the
firm and had the supervision of the books, while Harvey
took charge only of the shop.   Such is the proof ; and it
additionally appears that up to the year 1858, Hollings-
worth kept the books and made the entries, at least for
the most part.   After the year 1858 Robb was the book-
keeper and made the entries.   From an examination of
the journal entries prior to 1858, in comparison with the
handwriting of Hollingsworth proved to papers in the
cause, it is quite clear that the entries respecting the real
estate, as well as the book entries at large, were, during
that period, made by Hollingsworth.   After 1858 the en-
tries appear in a different handwriting, which is presuma-
bly that of the book-keeper, Robb.   Now, the making of
these entries by Hollingsworth prior to 1858, appears to
have been in the due course of his duties as a co-partner
at that period.   Even then if this fact stood alone, it
would be insufficient to discredit the entries.   But what-
ever force it could be supposed to have, must certainly be
neutralized by the clear and unequivocal recognition on

the part of Mr. Harvey in the attempted settlement with Hollingsworth's executor, of the correctness in form of the real estate account as it appeared upon the books, charging Hollingsworth with payments by the firm on the real estate, and crediting him with receipts from it.   Had the account untruly represented the transactions of the firm as to this real estate, and their interest in it, how can it be that, through so many years the fraud should have escaped the notice of Mr. Harvey ?   But conceding this to be possible, still it cannot be credited that the account, if so grossly false, would not at least have been repudiated by Mr. Harvey, when at last brought to his attention, and so fully canvassed in the conversations with Hollingsworth's executor, after his death.   There is another noteworthy fact bearing on this point, which is, that this series of entries against Hollingsworth, for real estate, was not closed until after his death.   The last entry appearing both on the journal and ledger, is under date of October 2, 1865.   The books were then under the exclusive control of Harvey as the surviving partner.

I leave now the question of a resulting trust, arising by operation of law, and proceed to inquire whether, though Hollingsworth paid the purchase money, the real estate may not be charged with an express trust arising out of the circumstances under which the property was bought.

This branch of the complainant's case encounters two difficulties.

First.—The evidence, upon a most careful consideration, does not satisfy me that in point of fact, the real estate was purchased on account of the firm under a pre-arrangement between the co-partners.

That is the case made by the bill for an express trust.

The material allegation on which this branch of the case must depend is, (paragraph 4,) that "it was agreed "by the firm of Hollingsworth, Harvey & Co., to purchase

" the real estate of Hollingsworth and Teas, or at least to
" bid it up so as to cover the claims of this firm, as well as
" of James Rice, against Hollingsworth & Teas ; and for
" this purpose Achilles Hollingsworth was authorized by
" the firm to attend to the sale and bid off the property
" (if it did not bring enough to cover their said judgment)
" for the firm and to take the title in his name for the said
" firm." Of this allegation there is no direct proof what-
ever. There is no evidence bearing upon it, of a single
act, transaction, memorandum in writing, conversation or
declaration of the firm, or of any member of it, occurring
prior to the sale. Nor is there any evidence tending to
prove the purpose assigned in the bill for the bidding in
of the property, on the partnership account,—that it was
in order to cover the judgments of the firm and of James
Rice, against Hollingsworth & Teas. On the contrary,
this alleged purpose encounters some strong improba-
bilities arising out of the facts ; for first, that would have
required a property which sold for $10,040,00, to be worth
to the firm not less than $17,500,00, the figures at which
it would have stood to them, if taken chargeable with the
judgments, both of the firm and of James Rice ; and
second, if the action was in part to cover Rice's judgment,
and if, as the case claims, the real estate was in fact
bought by the firm for this object, then how are we to
account for the total omission to give Rice, what he cer-
tainly would have been entitled to, a credit for the amount
of his judgment ? If this firm took the property under
the arrangement suggested, it was bound to pay his judg-
ments ; yet no account or notice of these judgments
appears from any evidence ever to have been taken,
through all the years in which Rice was a partner, nor in
the arrangements connected with his withdrawal from the
firm. It is true, the fact that the sale of a part of the real
estate was made under one of Rice's judgments, too far
behind to be at all likely to be reached by the proceeds of
sale, raises some inference that the judgment was thus

used to effectuate some collateral object rather than for collection merely. But what *was* the object is wholly without proof, is a subject of conjecture only, quite insufficient to support any conclusion in a judicial inquiry. The most probable conjecture (if conjecture on such a subject were of any value) would be that Rice's judgment was used with a view to bring into market the shop of Hollingsworth & Teas, to the end that it might be purchased by Hollingsworth, and the occupation of it thus secured to the firm of Hollingsworth, Harvey & Co., of which Rice was a member. That was the actual result of the measure ; and, in the absence of all direct evidence on the subject, the resulting benefit of the measure to Rice's firm must be taken as the best indication of the motive which prompted it.

It thus appears that the case as one of express trust arising out of the alleged pre-arrangement for the purchase of the real estate on account of the firm rests upon no direct proof, but only upon *circumstantial* evidence drawn from the subsequent dealings of the parties with the property, and their acts, transactions and declarations respecting it.

In this body of circumstantial evidence relied on in the argument, first and chiefly, was the fact insisted upon, that it was the firm who paid the purchase money. But under the view already taken by the Court that the purchase money was paid by Hollingsworth, all the force of that consideration is against the theory of any sort of trust.

Then there is the other fact relied on,—that the firm at its own expense put substantial improvements upon the real estate ; and so the firm did ; but the bearing of this transaction upon the question of the firm's ownership of the real estate is turned against the complainant by the testimony of Mr. Robb,—testimony which I have no warrant to discredit,—that in the attempted settlement with the executor Mr. Harvey claimed that these im-

provements should set off the claims of the executor to the proceeds of certain machinery and fixtures sold by the firm out of the real estate ; and also against a balance of the real estate account in favor of the executor,— which set-off was in fact agreed to.

I need hardly stop to notice the argument, drawn from Hollingsworth's supposed want of means for such a purchase, against the probability of his undertaking it on his own account. For it is proved that the firm was in circumstances as little fitting them to buy as was Hollingsworth. The truth is that neither he nor the firm were able to buy for cash. The purchase was only to a small amount for cash, the bulk of the purchase money having stood on a long credit, as it has resulted. This was contemplated in the purchase and it enabled Hollingsworth to carry the property ; so that the undertaking on his part was not so reckless as to be violently improbable.

Then we come to the other items relied upon as proving a trust. These are, the admissions of Hollingsworth, as insisted upon, to Teas ; the transactions with Mrs. Patten ; and the written statement, under Hollingsworth's hand, of the liabilities and property of the firm, which included this real estate and the liens upon it. I have with much care weighed these parts of the evidence.

The conclusion to which these, and all the circumstances of the case have brought me is, that the purchase of this real estate did contemplate the benefit of the firm, to this extent, viz : that there was at the time of the purchase, and for some indefinite period afterward, an expectation on the part of Hollingsworth and his co-partners that at some time not definitely fixed, but when it should suit the convenience of the firm, portions of the property which the firm occupied would be taken by it—an expectation never realized, and which was finally abandoned,— tacitly abandoned in Hollingsworth's lifetime,—and expressly so by Mr. Harvey after Hollingsworth's death, in

the transactron with the executor, as testified to by Robb. I use the term *expectation* as the strongest warranted by the evidence ; there was no contract nor any arrangement or understanding considered by either party to be obligatory.

This view alone harmonizes and satisfies all the evidence, and is in accordance with the natural probabilities arising from the situation of the parties and their relation to the property occupied.

It accounts for Mr. Teas' impression,—for his testimony shows only an impression, vague and general, derived, he knows not from whom, whether James or Achilles Hollingsworth,—that the purchase was made for the use of the firm.

It may also, together with the fact that there seemed to have been no periodical and exact settlements between the firm and its members, account for the omission to credit Hollingsworth from year to year with rent for the shop which the firm occupied, while he seems to have been regularly credited with the rents which fell into the partnership funds from other parcels of the property.

This view also accounts for the fact that Hollingsworth so largely drew upon the partnership funds to aid his payments on account of the real estate ; being charged, however, for such payments, inasmuch as he was the real owner until the firm might take the property, should that result eventually be reached.

The same view also affords the only possible explanation of the paper A, the evidence most strongly relied on as an admission by Hollingsworth of the firm's ownership of the real estate. That is a statement of liabilities and assets, showing on the one side, in connection with certain debts of the firm, the very liens given by Hollingsworth upon the real estate, and on the other side a valuation of the real estate added to the property and assets of the

firm ; and the whole balanced so as to show a surplus
of assets to the amount of $10,495.17. There is nothing
whatever on the paper, nor any collateral evidence, to
show the occasion or object for which this statement
was made. Now, waiving some doubt, arising out of
the testimony, whether that part of the statement which
connects the real estate with the partnership assets and
which gives to the paper whatever force it can have
as an admission of the firm's ownership, was written
by Hollingsworth,—assuming the paper to be all in
Hollingsworth's hand-writing, still it is impossible to treat
it, in the absence of any explanatian of the circumstances
or object for which it was made, as proving an original
purchase for the firm, so conclusively as to overcome the
body of evidence to the contrary, drawn from the books
of the firm and the transactions of the parties. We must
rather conclude that at some time while there remained
an expectation that the firm would take the property or
pending some proposal to that end, this statement was
made, in order to show in what condition the assumption
of the property by the firm, should it be taken, would
place its liabilities and assets. Its form and appearance
indicate that it was made for some transient use or pur-
pose which was not effectuated. For we can hardly sup-
pose that any statement made as an exhibit of the firm's
existing interest in this real estate and of its liability for
the liens, or a paper designed as evidence of the firm's
assumption of the property with its liens, would not have
been entered on the books. Further, the statement, in
addition to the mortgages against Hollingsworth includes
also, as a debt to be added to the original debts of the
firm, a mortgage of $400 to Robert E. Poole, a mortgage
which had no connection with this real estate. The
presence of this mortgage alone demonstrates that the
statement was made in contemplation of some arrange-
ments then executory and not afterward carried into
effect. For it is certain that the firm did not in fact by

proper conveyances, take this property nor assume the liabilities set forth ; nor did they at any time cease to charge Hollingsworth with payments made on account of the liens. There may have been some omissions to charge him, but these must be treated as accidental.

I pass to another item of the evidence relied on for the complainant,—the transactions between Hollingsworth and Mrs. Patton—These seem rather to disprove than to prove any interest of the firm in the house rented by her. It shows that in all Hollingsworth's dealings with her he acted as sole owner of the house, the firm never being named or referred to as interested in it. He, in his own name and not for the firm, rented the house to her. He, in his own name and not for the firm, suggested the sale to her. His statement that he could not give a "clear title,"—he did not say "a good title,"—had, according to the usage of that phrase, its natural and proper reference to the *liens*, and not to any defect or qualification of his ownership. Indeed this very statement shows that he was not, in that conversation, representing the firm ; because, had it been a sale for the firm which he was speaking of, its interest in the property would have offered no insuperable obstacle, since the firm's release would so easily have perfected the title. Further—Hollingsworth's suggestion to Mrs. Patton when he rented to her at $120.00 per annum, with respect to setting off the rent against an equal sum due her annually from the firm for interest, that this arrangement might continue "*so long as he remained in the firm*," clearly implied an exclusive ownership in himself. Mrs. Patton's testimony wholly fails of its purpose to prove an admission by Hollingsworth of an interest in the firm.

I have considered all the evidence relied on for the complainant. It warrants the conclusion that the sale may have contemplated,—probably did,—the benefit of the firm so far as to provide for its occupation of the shop,

61—DEL. CH. IV.

and to leave open to it the chance of owning the shop at some future time ; but that the firm took a present interest under the purchase, or that it had a right by any contract or obligatory arrangement to take the property in the future, is a conclusion not required on the one hand to satisfy the facts relied upon for the complainants, while on the other hand it is forbidden by an irresistible weight of evidence to the contrary, drawn from the books of the firm ; from the transactions of the parties,—who treated the real estate unequivocally and persistently through many years up to and after Hollingsworth's death as his exclusive property ; and from the yet unexplained total omission on the part of the firm in the first instance, to take the real estate in its own name, or then or at any time afterward to take some written evidence of an interest of such great value.

Second.    There is another fatal obstacle to the effort to set up an express trust based upon the alleged arrangement, previous to the sale, for the purchase of the property by Hollingsworth on account of the firm.   It is this :—Hollingsworth having purchased in his own name, taken the title and paid the purchase money, a trust could be raised against him only by contract, and such contract, under the statute of frauds, must be in writing. Now, were the alleged understanding for a purchase on the partnership account ever so clearly proved, and even if there could be raised out of the transaction a legal consideration giving it the force of a contract on the part of Hollingsworth to buy for the firm and not for himself. (as to which we need not stop to inquire,) still such a contract being for an interest in lands would be within the statute.

The application of the Statute of Frauds to cases of this nature seems quite well settled upon authority.   It was distinctly so decided in *Bartlett vs. Pickersgill*, 1 *Eden* 516, where, upon a bill to compel a conveyance of an

estate alleged to have been purchased by the defendant for the complainant, the Court rejected parol evidence of an agreement to that effect, the complainant not having paid any part of the purchase money, and there being no fraud or part performance to take the case out of the statute.

The doctrine of that case is recognized as settled law in 2 *Sugd. on Vendors, Ch.* 20 *Sec.* 2, *part* 2 and 2 *Story Eq. Jurs.* 1201 *a* ; and by Chancellor Kent in *Botsford vs. Burr,* 2 *Johns. Ch. R.* 409, and Justice Story in *Smith vs. Burnham,* 3 *Sumn.* 462.

Chancellor Kent in *Botsford vs. Burr,* says : " If, " therefore, the party who sets up a resulting trust made " no payment, he cannot be permitted to shew by parol " proof that the purchase was made for his benefit, or on " his account. This would be to overturn the Statute of " Frauds, and so it was ruled by Lord Keeper Henley in "the case of *Bartlett vs. Pickersgill.*" Justice Story in *Smith vs. Burnham* thus put the rule : " I take it to be " clear," he says, "upon principle, that if one person con- " tracts by parol with another that he will purchase an " estate for the latter, and he purchases the estate and " takes the conveyance in his own name, and pays for it " out of his own money, and not out of that of the other " party ; that will not create a trust by implication of law " in favor of the other party. The law in such case treats " it as a *parol contract to purchase and hold in trust for the* " *benefit of another.*"

These are *dicta,* it is true, but they come from high authority as exponents of the law. A direct decision on the point and in a very strong case, is that of *Kisler vs. Kisler,* 2 *Watts,* 323, where the bidder at a public sale declared that he purchased for another person, who was present and assented ; but the bidder afterward took the title in his own name and paid the purchase money. The Court, in an able opinion by C. J. Gibson, fully eluci-

dating the whole subject, held that such a transaction could have no force, short of being treated as a contract for an interest in land, and that as such it was within the Statute of Frauds.

I do not forget that parol trusts of lands, as distinguished from contracts for an interest in lands, are admissible under our Statute of Frauds, which has omitted the 7th section of the English Statute of Frauds,—the section requiring all trusts of lands to be evidenced by writing. But those parol trusts which are prohibited by the English statute and tolerated by our own, are such as a grantor of the legal estate may declare in favor of a person not named in the conveyance, but who is the beneficial object of it. They do not include declarations of a grantee, set up to establish by their own force a trust against him of an estate which he holds as a purchaser for a consideration paid by himself. The difference is very material. If I convey land to A, declaring it to be in trust for B, that is in no sense a contract for an interest in land, such as the Statute requires to be in writing. It is *a trust executed*, not a *contract executory* ; and though a pure gift, it is nevertheless valid ; for against the grantor it is effectual as a gift executed, and against the grantee also it is effectual, because as to him the confidence reposed by the grantor in making the conveyance is a sufficient consideration to support the trust, and his refusal to execute it is a fraud. It was to save trusts of this nature that our statute omitted the 7th section of the English statute. But declarations by the purchaser of land, who has paid the purchase money and holds the title, stand upon a different footing. No parol declarations, or arrangement resting upon parol evidence, can affect him with a trust ; for any such arrangement, if without a consideration, is *nudum pactum*, while on the other hand if the arrangement rest upon a sufficient consideration, it becomes a contract for an interest in land within the prohibitory clause of the

statute.    It is perfectly immaterial whether the transaction relied upon is a parol undertaking by one, prior to the purchase, to buy and hold in trust for another ; or whether it is a parol contract by one already having title to land to hold it in trust.

The result seems to be that as against one purchasing lands in his own name and taking the legal title, a trust or interest in favor of a third person can be set up only in one of two modes, viz : either as a resulting trust, by operation of law, from the actual payment of the purchase money, or, where the claimant has not paid the purchase money; there must have been a contract in writing sufficient within the Statute of Frauds.

I cannot base the present complainant's claim upon either of these grounds.

I come now to consider, much more briefly, the second branch of the case,—the prayer for a partnership account to be taken under a decree of the Court.

There are no circumstances set forth in this bill which require the interposition of the Court for an account and settlement of the partnership affairs under its decree, except of course the alleged equitable ownership by the firm of the real estate, which is adjudged to be not sustained by proof.

A court of equity does not as of course undertake the winding up of the business of a dissolved partnership, by decreeing and superintending the taking of accounts and the distribution of the surplus. The settlement of the partnership affairs, in the absence of some special necessity for the aid of the court, is the duty of the co-partners ; and in the case of a dissolution by the death of one partner, this becomes the special duty of the survivor, who, for the very purpose of enabling him to perform it, is invested by law with the possession of the assets, books

and papers of the firm and with the control of its affairs.
It is only when the aid of the court is required to remove
some impediment to a settlement or to compel a delin-
quent party to perform some duty with respect to it, that
the court will interfere.   As when a surviving partner re-
fuses or neglects to proceed to a settlement, the repres-
entatives of a deceased partner may file a bill to compel
him to do so. And this, in cases of a dissolution by death, is
the more common instance of equitable relief.   But aid
may also be given to the surviving partner when it
becomes necessary ; as if part of the assets consists of
real estate held in the name of the co-partners as tenants
in common, or as is alleged in this case, held in the name
of one alone for the use of the firm, a bill will lie in order
to effect a conversion of it and to bring the proceeds into
the partnership account.   So if the deceased co-partner
has withdrawn part of the assets which ought to be re-
turned and brought into a partnership account,the executor,
or administrator may be compelled by a bill, if he refuses
otherwise, to bring them in or to submit to be charged with
them.    So, if there are matters necessary or proper to
enter into a partnership account which do not appear
upon the partnership books and for which a discovery is
necessary, a bill for that purpose may be filed.   Even in
these cases of interference to aid a surviving partner, the
court does not go beyond the special relief needed and
and enter at large upon the duty of stating partnership ac-
counts, and making•distribution.    The surviving partner
can ordinarily do this himself when the special impedi·
ments are removed by a proper decree, he having the sole
control of the whole subject-matter.

It is in cases of a different class, as where several co-
partners, all living and having like authority and control,
are unable to agree as to the principles or mode of settle-
ment, that it may become necessary for the court, if its
aid be invoked, to direct a general account and settle-

ment to be taken under its decree　But when a single surviving partner has the whole subject-matter under his control, with no real estate to be converted into money, no assets withdrawn from the partnership to be restored, with the books and papers in his possession and no discovery needed in order to supply any deficiency in them, and with no controverted questions raised needing to be judicially determined,—it is difficult to see why the court should interfere.　Yet such is the case presented by this bill, excluding of course what concerns the real estate. That part of the case having been adjudged to be unsustained by proof, I must consider the bill for the purpose of the prayer for a general account, as if the allegation as to the real estate were not contained in it.　Then what does it offer as a ground for any interference ?　It presents only the most ordinary case of a partnership dissolved by the death of one partner with everything left under the the control of the survivor, except some $4,100 which the surviving partner has allowed the executor to receive. Mr. Harvey confessedly has the books and papers of the firm.　By his bill he expressly states that they are of themselves adequate for an account and settlement ; no aid by way of discovery, in addition to the books, is then necessary : and if Mr. Harvey's want of familiarity with them or with book-keeping is a hindrance, that can be removed by his employing an expert.　With respect to the partnership assets, it does not appear by the bill that there have been any which are not in the surviving partner's possession, except the $4,100 which he says he allowed the executor to receive, $3,000 for his share of the anticipated surplus, and $1,000 as a loan. The bill seeks no restitution of these sums as being now needed for the payment of debts, or otherwise in the settlement of the estate.

At the hearing of the cause certain checks were produced, drawn by Hollingsworth in the name of the firm, some to his own order.　They were treated in the argu-

ment as sums drawn from the firm for his own use, and not charged against him on the books ; and this was urged as raising a necessity for an account.   But there is no allegation in the bill of any withdrawal or misappropriation of the assets by Hollingsworth, under which these checks can be made a ground of relief.   To afford a ground of relief it should be *alleged* that these sums were withdrawn by Hollingsworth and not charged on the books,—that the surviving partner had proceeded to a final account and settlement, claiming these as proper charges against the deceased partner's estate, and that the executor had refused to recognize them.   In such case the court would hear evidence, and decree as might be necessary.

Looking through the bill, and excluding the allegations as to the real estate there appears to be no hindrance whatever to the surviving partner, in proceeding to close the affairs of the partnership, except that the executor will not come to a settlement.   The complaint is (page 12) "that the complainant has repeatedly applied to the said "William G. Pennypacker. as executor aforesaid, to "settle the partnership business according to the books " and papers of the late firm, in order to ascertain the "balance to be divided between the complainant and the " estate of the said Achilles Hollingsworth, which com- " plainant and said Pennypacker could have easily made, " &c."   No necessity for the interference of a court of equity arises here.   If, as the bill alleges, a settlement can be easily made by the books, the surviving partner can proceed to realize the assets, pay the debts, state the proper account, according to the books, shewing the balance, if any, and how distributable ; if any portion shall be found payable to the executor, it can be tendered to him, if any sum ought to be refunded out of what the executor has received, it can be demanded of him.   If at this point the surviving partner and the executor should disagree with respect to any elements entering into the

account as exhibited and insisted upon by the surviving partner, then a court of equity might properly be resorted to to settle the dispute, and (should it be found necessary) to state an account between the parties, according to its view of their respective rights on the points in controversy.

In point of fact, the real obstacle to a settlement will have been removed by the decree in this cause. That obstacle was the dispute as to the ownership of the real estate. Excluding this from the controversy, nothing else appears on the record to prevent the surviving partner from proceeding to a final account and settlement.

If, however, any difficulty should arise requiring the aid of this Court to the surviving partner,—as by a decree against the executor for a discovery, or for the production of anything necessary to be in the surviving partner's possession, or for the restoration of assets withdrawn from the partnership by Hollingsworth in his life-time, or by the executor since his death,—in any such case, properly brought before the Court and proved, the requisite relief will of course be given.

The bill must be dismissed with costs.

NOTE. Before the decision of the case of *Harvey vs. Pennypacker, Ex'r,* here reported, a bill was filed in the same Court by the administrator of James Rice, deceased, to establish a resulting trust in the same land, as to an equal third interest, to which it was claimed Mr. Rice was entitled as partner in the original firm of Hollingsworth, Harvey & Co., during the existence of which the purchase of the real estate in question was made. Before the testimony was taken in that case, the present decision was made and the proofs in the case begun by Mr. Rice's administrator were amplified and rendered more complete, and the advantage derived, by the counsel in that case, of being able to meet the view of the evidence upon the question of a resulting trust, which had been taken in the foregoing opinion of the Chancellor. The result of the suit was a decree by the succeeding Chancellor, dismissing the bill, from which an appeal was taken to the Court of Errors and Appeals. At the June Term, 1877, a decree of reversal was rendered, and the resulting trust was held, upon the proofs in that case, to be established.

62—DEL. CH. IV.

As that case will be reported in regular course, it might seem to have been unnecessary to embody in this volume a report of the present case. There was, however, no conflict between the decision of the Court of Errors and Appeals and the opinion here reported upon the questions of law involved ; and references to this case in the opinion of the succeeding Chancellor and of the Court of Errors and Appeals in the other case seem to render this report necessary, to make intelligible the course of the litigation. Besides, the discussion of the principles of law applicable to resulting trusts, and concerning which there is no substantial difference of opinion between the different judges who heard these cases, was rather more full in the present opinion than in either of the others, special reference being made to them.